**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Sergio Silva,

               Plaintiff,

v.

Butori Corporation, et al.,

               Defendants.

No. CV-19-04904-PHX-MTL

**ORDER**

Pending before the Court is Defendants' Motion to Compel Arbitration and Dismiss Without Prejudice.  (Doc. 24.)  The Motion is fully briefed.  (Docs. 24, 30, 32, 36.)  For reasons that follow, Defendants' Motion to Compel Arbitration and Dismiss Without Prejudice is granted.[1]

I.     **BACKGROUND**

Mesa Imports Inc. ("MII") owned and operated several car dealerships.  (Doc. 29 at 3, ¶ 9.)  MII was exclusively owned by Paul Sparrow and Robert Thurston.  (*Id.*); (Doc. 24 at 2.)  In 2007, Paul Sparrow, Robert Thurston, and Defendant Richard Cvijanovich formed Defendant Butori, which also owned and operated numerous car dealerships.  (Doc. 31 at 2, ¶ 11); (Doc. 24-1 at 9, ¶ 6.)

In November 2007, Plaintiff Sergio Silva was hired by MII as the Human Resources

---

[1] Plaintiff requested oral argument (part of Doc. 30).  After reviewing the pleadings, however, the Court determined that oral argument would not have aided the Court's decisional process.  *See e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (no prejudice in refusal to grant oral argument on summary judgment motion where parties had adequate opportunity to provide the court with evidence and a memorandum of law); *see also* LRCiv 7.2(f);

Manager.   (Doc. 30 at 2.)   On his first day of employment at MII, Silva signed an Arbitration Agreement ("the Arbitration Agreement" or "Agreement"), which states in pertinent part:

> I recognize that differences may arise between MESA IMPORTS INC. dba San Tan Honda Superstore, San Tan Collision Center of Mesa, San Tan Service Center of Mesa, and San Tan Service Center of Gilbert (the "Company") and me regarding my employment, my potential employment, or the termination of my employment with the Company.  I understand and agree that by entering into this Agreement to Arbitrate Claims ("Agreement"), I am receiving the benefit of a speedy, impartial, economical, and binding method to decide any disputes with the Company.
>
> *I understand that all references in this Agreement to the Company will be a reference also to all parent, subsidiary, and affiliated entities*, all benefit plans, the benefit plans' sponsors, fiduciaries, administrators, affiliates, and all successors and assigns of any of them, and all directors, officers and employees who are acting in their capacity as an agent of the Company.

> CLAIMS COVERED BY THE AGREEMENT
>
> The Company and I mutually agree that we shall resolve by arbitration all past, present or future claims arising out of my application for employment, employment, or the termination of my employment, including, but not limited to . . . claims for discrimination (including but not limited to race, sex, sexual harassment, sexual orientation, religion, national origin, age, workers' compensation, marital status, medical condition, handicap or disability); claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance . . . .

> REQUIREMENTS FOR MODIFICATION OR REVOCATION
>
> This Agreement to arbitrate shall survive the termination of my assignment/employment and the expiration of any benefit . . . .

> CONSTRUCTION
>
> [T]the Federal Arbitration Act shall govern the interpretation, enforcement, and all proceedings pursuant to [the] Agreement.  To the extent that the Federal Arbitration Act is inapplicable, Arizona state law pertaining to agreements to arbitrate shall apply.

(Doc. 24-1 at 3, 6) (emphasis added).

As the Human Resources Manager of MII, Silva provided human resources services to MII-owned dealerships, as well as to Hyundai of Tempe (owned by Hyundai of Tempe, LLC), Acura of Tempe (owned by Executive Automotive of Tempe, Inc.), Porsche

1   Chandler (owned by Autobahn 202, LLC) and two Butori-owned dealerships: Subaru
2   Superstore of Chandler and Volvo of Tempe.  (Doc. 30 at 3); (Doc. 24 at 2); (Doc. 24-1 at
3   9.)  Silva's duties included ensuring that new employees signed arbitration agreements.
4   (Doc. 24 at 3.)

5       In May 2013, MII sold its San Tan Honda Superstore of Chandler dealership to
6   AutoNation.  (Doc. 24 at 3); (Doc. 30 at 3.)  AutoNation also purchased Hyundai of Tempe.
7   (Doc. 24 at 3.)   According to Silva, his employment with MII ended when AutoNation
8   purchased these two dealerships.  (Doc. 30 at 3.)  AutoNation offered Silva a position as
9   payroll clerk, which he declined.  (*Id.*); (Doc. 29 at 3, ¶ 12.)  Defendant Cvijanovich then
10  offered Silva the opportunity to "come work for him" as the Human Resources Manager
11  of Butori.  (Doc. 30-1 at 28.)  Silva accepted Cvijanovich's offer, and on May 21, 2013,
12  Silva began managing Butori's human resources department.  (Doc. 29 at 4, ¶ 13.)  The
13  parties agree that Silva's change in employer from MII to Butori was instantaneous.  (Doc.
14  36 at 2.)  There was no lapse in Silva's benefits and all his accrued paid time off was
15  transferred from MII to Butori.  (*Id.*)

16      Silva did not sign a new arbitration agreement when he began working for Butori,
17  and nobody at Butori ever directed him to sign one.  (Doc. 24 at 3); (Doc. 30 at 3.)  It was
18  Silva's responsibility, however, to ensure that Butori employees signed an arbitration
19  agreement.  (Doc. 24 at 3); (Doc. 30 at 3.)

20      Silva filed this lawsuit in August 2019, alleging that Defendants Butori and Richard
21  Cvijanovich[2] committed violations of the Family and Medical Leave Act ("FMLA"), that
22  they discriminated against him because of his natural origin,[3] and that they retaliated
23  against him for investigating complaints of sexual harassment.  (Doc. 1); (Doc. 29.)
24  Defendants moved to compel arbitration, stating that arbitration is required because Butori
25  is expressly included in the Agreement's arbitration provision as an "affiliated entity" of
26  MII.  (Doc. 24 at 6-7.)  Defendants alternatively argue that the Agreement applies to Silva's

27  _____
    [2] Defendant Lisa Cvijanovich is Richard Cvijanovich's wife and was joined solely for
28  purposes of obtaining jurisdiction over the marital community. (Doc. 29 at 2-3, ¶ 8.)
    [3] Silva asserts that he was born and raised in Mexico and lawfully immigrated to the United
    States as an adult.  (Doc. 29 at 4, ¶ 17.)

employment with Butori under the theory of alternative estoppel (Doc. 24 at 7-9) and that the doctrine of "unclean hands" renders Silva bound by Butori's arbitration agreement that he never signed (Doc. 24 at 10-11).  Silva states that he did not mutually assent to arbitrate his employment claims against Butori, and that the Arbitration Agreement is procedurally and substantively unconscionable.  (Doc. 30 at 8-11, 12-18.)

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") was enacted in response to widespread judicial hostility toward arbitration agreements.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Section 2 of the FAA states that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[4]  9 U.S.C. § 2.  The Supreme Court has described this provision of the FAA as both a "liberal federal policy favoring arbitration," and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC*, 563 U.S. at 339 (*citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), *and Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

In line with these principles, courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms.  *AT&T Mobility LLC*, 563 U.S. at 339 (citations and quotations omitted); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp.*, 207 F.3d at 1130 (*quoting Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original).  The Court's role under the FAA, therefore, is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at

---

[4] The FAA applies to employment contracts except those of transportation workers.  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113-19 (2001).

1130.

"When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016) (internal citation omitted); *see also Craft v. Campbell Soup Co.*, 177 F.3d 1083, 1084 n.4 (9th Cir. 1998) (treating a motion for summary judgment as a de facto motion to compel arbitration), *abrogated on other grounds by Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).  Generally, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).  But where the issue is whether there exists an agreement to arbitrate, the party seeking to enforce an arbitration agreement bears the burden of showing that it exists. *See, e.g., Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962-964 (9th Cir. 2007)*; Three Valleys Mun. Water Dist. V. E.F. Hutton & Co*., *Inc.*, 925 F.2d 1136, 1139-42 (9th Cir. 1991).

## III.   DISCUSSION

### A.   Mutual Assent

Silva does not meaningfully dispute that Butori was an "affiliated entity" under the Agreement before MII was sold.  Nor does he argue that he failed to read and understand the Agreement before signing.  Instead, he argues that he did not mutually assent to arbitrate his claims against Butori because Butori did not exist as an affiliated entity of MII when the Agreement was formed, and because he did not know that Butori would ultimately become his employer.  (Doc. 30 at 5-8.)  The Court finds neither argument persuasive.

To create a valid enforceable contract, there must be "an offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, and mutual assent." *Buckholtz v. Buckholtz*, 246 Ariz. 126, 129 (App. 2019) (citations omitted).[5]

---

[5] District courts generally apply state law contract law in determining the enforceability of an arbitration agreement that falls within the ambit of the FAA. *First Options of Chicago,*

These principles apply with no less vigor to formation of arbitration contracts.  *See*, *e.g.*, *Estate of Decamacho ex rel. Guthrie v. La Solana Care and Rehab, Inc.*, 234 Ariz. 18, 21 (App. 2014).   Before a binding contract is formed, the parties must mutually consent to all material terms.  *Hill-Shafer P'ship v. Chilson Family Tr.*, 165 Ariz. 469, 473 (1990).  Generally, a party who signs a written agreement "is bound to know and assent to its provisions in the absence of fraud, misrepresentation, or other wrongful acts by the other party."  *Teran v. Citicorp Person-to-Person Fin. Center*, 146 Ariz. 370, 372 (App. 1985).  But a court may find a lack of mutual assent, and therefore that no binding agreement exists, if there is a mutual misunderstanding between the parties that is reasonable under the specific circumstances of the case.  *Hill-Shafer P'ship*, 165 Ariz. at 475.  Mutual assent is assessed based on objective evidence, not on the hidden intent of the parties.  *Buckholtz*, 246 Ariz. at 129.

Silva's argument is that the Agreement lacked mutual assent because he attached a different meaning to the term "Company" than MII and Butori.  (Doc. 30 at 6.)  The Court does not find this alleged misunderstanding reasonable under the circumstances.  Sufficient objective evidence exists to conclude that Silva assented to arbitrate his claims with all parent, subsidiary, and affiliated entities of MII, not just those that existed at the time he signed the Agreement.   Silva was a Human Resources professional whose job responsibilities included facilitating arbitration agreements.  The plain language of the Agreement that Silva signed indicates that it was between him and the "Company," which is defined by the Agreement as MII, certain named dealerships, and "all parent, subsidiary, and affiliated entities" of MII.  (Doc. 30-1 at 8.)  Because the Agreement specifically lists certain named dealerships within the definition of "Company" (*i.e.*, San Tan Honda Superstore, San Tan Collision Center of Mesa, San Tan Service Center of Mesa, and San Tan Service Center of Gilbert), while simultaneously including unnamed "parent, subsidiary, and affiliated entities," it would not have been reasonable for Silva to assume

_____

*Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Because Plaintiff is a resident of Arizona, Defendants' principal place of business is Arizona, and the Agreement itself provides that Arizona law governs, (Doc. 24-1 at 6), the Court will apply Arizona law to determine whether the Arbitration Agreement compels arbitration of Silva's claims.

that the Agreement pertained solely to parent, sibling, and affiliated entities that existed when he signed the Agreement.  If the Agreement had intended to limit "parent, subsidiary, and affiliated entities" to those that existed when the Agreement was signed, it would have listed those entities by name like it did with the other dealerships.  Further, while he was employed by MII, Silva provided human resources services to multiple dealerships that began operating after he signed the Agreement in 2007.  (Doc. 32 at 7 n.2.)  And he apparently never questioned the scope of the Agreement to those entities, despite his role in facilitating similar agreements for those dealerships' employees. (Doc. 24-1 at 10, ¶ 22.)

Silva's argument that he did not mutually assent to arbitrate his claims against Butori because he did not anticipate that Butori would eventually become his employer, is equally unavailing.  Because any relationship that Butori may have had with MII as a "parent, sibling, [or] affiliated entit[y]" would not have been altered by Silva's change in employer, the fact that that Butori ultimately became Silva's employer does not vary the analysis.  The Court finds that there was mutual assent to the Arbitration Agreement, which applies to parent, subsidiary, and affiliated entities of MII, regardless of whether they were formed after Silva signed the Agreement.

### B.  Affiliated Entities

The Court must now decide whether Butori is included in the "Company" as a "parent, subsidiary, [or] affiliated entit[y]" of MII and whether Defendant Cvijanovich was a director, officer or employee who was acting in his capacity as an agent of the "Company."  (Doc. 30-1 at 8.)  Defendants argue that Butori is expressly included in the Arbitration Agreement as an affiliated entity of MII and that Cvijanovich was an officer of Butori, acting in his capacity as an agent of the Company.  (Doc. 24 at 6); (Doc. 32 at 3); (Doc. 36 at 11.)  The Court agrees.

First, the plain language of the Arbitration Agreement indicates that it was broadly drafted to encompass employment disputes between employees of MII and various affiliated member-entities of the dealer group, which shared administrative costs and employees.  (*See* Doc. 24 at 7); (Doc. 30-1 at 8) (encompassing disputes between "[MII]

dba San Tan Honda Superstore, San Tan Collision Center of Mesa, San Tan Service Center of Mesa, and San Tan Service Center of Gilbert," as well as all "parent, subsidiary, and affiliated entities.")

Second, the relationship between MII and Butori satisfies the common and ordinary meaning of the term "affiliated."  Because "affiliated entity" is not defined in the Agreement, the Court will assign the words their normal meaning, starting with the dictionary definitions. *See Horizon Res. Bethany Ltd. v. Cutco Indus., Inc*., 180 Ariz. 72, 77 (App. 1994) (giving words in a contract their normal meaning*); W. Corrs. Group, Inc. v. Tierney,* 208 Ariz. 583, 587 (App. 2004) (explaining that courts refer to established and widely used dictionaries to determine the plain and ordinary meaning of a word). Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (11th ed. 2019); (Doc. 24 at 7.)  Webster's Dictionary defines "affiliated" as "closely associated with another typically in a dependent or subordinate position." *Affiliated*,  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/affiliated (last visited May 7, 2020).

The Court concludes that Butori and MII were sufficiently and closely connected, such that Butori was an affiliated entity of MII.  There was common ownership between MII and Butori because Paul Sparrow owned eighty percent of MII and fifty percent of Butori.  MII and Butori were interdependent because they shared staff and administrative expenses.  To that end, when Silva was employed by MII he performed various work for the Butori-owned dealerships, and Butori shared in the cost of Silva's salary.  After MII was sold and Silva declined a position with AutoNation, his employment was effectively moved to Butori, the affiliated entity.  Silva's accrued paid time off additionally transferred seamlessly from MII to Butori.  The Court therefore finds that Butori was an affiliated entity of MII and that the Agreement applies.

Turning to Defendant Cvijanovich, it is undisputed that he was part-owner and the chief executive officer of Butori who hired Silva as the Butori's Human Resources

Manager. (Doc. 29 at 2-3, ¶ 8); (Doc. 31 at 2, ¶ 8.)  The Amended Complaint alleges that Cvijanovich was Silva's employer and that he committed various violations of the FMLA and Title VII in that capacity.  (Doc. 29.)  The Court therefore finds that Cvijanovich was a director and officer of Butori, and that the Agreement applies to him, too.

### C.    Scope of the Agreement

The Amended Complaint alleges that Defendants Butori and Cvijanovich fired Silva for attempting to exercise his FMLA rights, that they retaliated against him for investigating allegations of sexual harassment, and that they discriminated against him because of his national origin. (Doc. 29.)  The Agreement states that Silva and the Company agreed to resolve by arbitration "all past, present or future claims arising out of [Silva's] application for employment, employment, or the termination of [his] employment, including . . . claims for discrimination (including . . . national origin . . .); claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance, except claims excluded in the section of this Agreement entitled 'Claims Not Covered in the Agreement.'"  (Doc. 30-1 at 8.)  Claims not covered in the Agreement include claims for workers' compensation and unemployment benefits, claims for unauthorized disclosure of trade secrets, and other claims not applicable here.  (*Id.*)

Silva argues that the Agreement does not encompass the instant dispute because he did not sign a new arbitration agreement with Butori, because he was not asked to reaffirm the Agreement when he began working for Butori, and because he was never told that the Agreement would apply to his employment with Butori.  (Doc. 30 at 8.)  Silva undoubtedly understood, however, that it was Butori's preference to arbitrate employment disputes with its employees because it was Silva's job to ensure that Butori's employees signed arbitration agreements.  It would be anomalous to exclude this dispute from arbitration on account that nobody told Silva to reaffirm his prior Agreement.  The Agreement provides that it survives the termination of Silva's employment, and that it can only be revoked in writing by the parties, specifically stating an intent to revoke it.  (Doc. 30-1 at 11.)  Neither Silva nor Butori repudiated the original Agreement, which for reasons stated above, applied

to Silva's employment with Butori.  The Court therefore finds that each of Silva's claims against Defendants pertain to his employment with Butori and are covered by the Agreement.

### D.    Unconscionability

Silva alternatively argues that the Arbitration Agreement is unenforceable because it is procedurally and substantively unconscionable. (Doc. 30 at 13-17.)   Procedural unconscionability addresses the fairness of the bargaining process, and substantive unconscionability concerns the actual terms of the contract, examining the relative fairness of the obligations assumed.  *Gullett on behalf of Estate of Gullett v. Kindred Nursing Centers West, L.L.C.*, 241 Ariz. 532, 535, 540 (App. 2017) (citations and quotations omitted). The Court does not agree that the Agreement is unconscionable.

### 1.    Procedural Unconscionability

When evaluating procedural unconscionability courts look to concerns such as "'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Gullet*, 241 Ariz. at 540 (*citing Dueñas v. Life Care Ctrs. Of Am., Inc.*, 236 Ariz. 130, 135 (App. 2014)). Procedural unconscionability considers factors bearing on the real and voluntary meeting of the minds: "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, [and] whether alterations in the printed terms were possible . . . ." *Dueñas*, 236 Ariz. at 135 (*citing Maxwell v. Fidelity Fin. Servs., Inc.*, 184 Ariz. 82, 89 (1995)).  Other factors include whether the contract was separate from other paperwork, whether it used conspicuous typeface, and whether it was signed hurriedly without explanation in emergency circumstances.  *Dueñas*, 236 Ariz. at 135.

Silva claims that the Agreement is procedurally unconscionable because it was non-negotiable, and he was required to sign it as a condition of employment.  (Doc. 30 at 13.) He also argues that there was mistake and surprise regarding the Agreement's application to his employment with Butori.  (*Id*.)  The Court disagrees.  There is no evidence in the

record that Silva was deprived of the opportunity to thoroughly review the Agreement when deciding whether to sign it.  Nor is there evidence that fine print or conspicuous typeface rendered the Agreement's terms indiscernible.  The Court also considers that Silva was an educated, experienced human resources professional who had experience administering (and presumably explaining) arbitration agreements to would-be employees.  For reasons stated above, there was no "unfair surprise"—any belief by Silva that the Agreement would not apply to future parent, subsidiary, and affiliated entities of MII was not reasonable.   Finally, the take-it-or-leave-it nature of the Agreement does not automatically render it procedurally unconscionable, particularly where Silva does not allege that he would have declined employment with MII or Butori had he understood that the Agreement applied all parent, subsidiary and affiliated entities of MII.  *See Longnecker v. Am. Exp. Co.*, 23 F. Supp. 3d 1099, 1108-09 (D. Ariz. 2014) (take-it-or-leave-it contracts are not automatically procedurally unconscionable in Arizona); (Doc. 30-1 at 3-7.)  The Agreement is not procedurally unconscionable.

### 2.      Substantive Unconscionability

Relevant factors when evaluating substantive unconscionability include "whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party, whether there is an overall imbalance in the obligations and rights imposed, and whether there is a significant cost-price disparity."  *Dueñas*, 236 Ariz. at 136.  An arbitration agreement may be substantively unconscionable if the fees and costs to arbitrate are so excessive that they "deny a potential litigant the opportunity to vindicate his or her rights." *Id*. (citations omitted).

Silva argues that the Agreement is substantively unconscionable because it exposes him to costs and expenses he might not incur in a judicial proceeding.  (Doc. 30 at 15.)  He points to the Agreement's provision that requires him to pay the arbitrator for reviewing a motion for summary judgment and motion for reconsideration, unless the arbitrator orders otherwise.  (*Id*.); (Doc. 30-1 at 10-11.)  He also cites the Agreement's provision that affords the prevailing party attorneys' fees but leaves any award for costs and other expenses to

the arbitrator's discretion.  (*Id*.)  According to Silva, this provision is particularly problematic because he would automatically be entitled to costs *and* fees if he were to prevail on his FMLA claim in district court.  (Doc. 30 at 15) (*citing* 29 U.S.C. § 2617(a)(3)).

The Agreement is not substantively unconscionable.  First, the Court notes that the Agreement requires the Company to pay any filing fees and the cost of the Arbitration fee.  (Doc. 30-1 at 11.)  Second, the Agreement gives the arbitrator discretion to forgo the requirement that the moving party pay for the arbitrator's time associated with reviewing a motion for summary judgment or motion for reconsideration.  (*Id*. at 10-11.)  Third, the Agreement acknowledges that if a party prevails on a statutory claim in a jurisdiction that requires a different allocation of fees and costs, then such law shall be followed.  (*Id*. at 11.)  Therefore, if Silva prevails in arbitration on his FMLA claim, the Agreement would require the arbitrator to award him fees *and* costs. The Court accordingly finds that the Agreement does not contain a fee shifting scheme that would deny a potential litigant the opportunity to vindicate his or her rights.

While Silva additionally argues that the Agreement's limitations on discovery, in combination with the Agreement's allocation of fees, renders it substantively unconscionable, the Court need not address the discovery limitations because Silva concedes that, standing alone, they are insufficient to invalidate the contract.  Because the Court has found that Butori is included in the Agreement as an affiliated entity of MII, the Court also need not address Butori's arguments regarding equitable estoppel and unclean hands.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** denying Plaintiff's request for oral argument.  (Part of Doc. 30.)

**IT IS ORDERED** granting Defendants' Motion to Compel Arbitration and Dismiss Without Prejudice. (Doc. 24.)

///

///

1

2

**IT IS FURTHER ORDERED** directing the Clerk of the Court to dismiss this action without prejudice and close the case.

3

Dated this 8th day of May, 2020.

4

5

Michael T. Liburdi
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28